*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 12a0202p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

UNITED STATES OF AMERICA,

        *Plaintiff-Appellee,*

        *v.*

BRENT MICHAEL VREELAND,

        *Defendant-Appellant.*

Nos. 10-1033/1034

Appeals from the United States District Court
for the Western District of Michigan at Grand Rapids.
Nos.: 04-00232-006; 09-00130-001—Gordon J. Quist, District Judge.

Argued: October 6, 2011

Decided and Filed: June 29, 2012

Before: MARTIN and GRIFFIN, Circuit Judges; and ANDERSON, District Judge.[*]

———————————

**COUNSEL**

**ARGUED:** Scott Graham, SCOTT GRAHAM PLLC, Portage, Michigan, for Appellant. Daniel Y. Mekaru, ASSISTANT UNITED STATES ATTORNEY, Grand Rapids, Michigan, for Appellee. **ON BRIEF:** Scott Graham, SCOTT GRAHAM PLLC, Portage, Michigan, for Appellant. Daniel Y. Mekaru, ASSISTANT UNITED STATES ATTORNEY, Grand Rapids, Michigan, for Appellee.

———————————

**OPINION**

———————————

GRIFFIN, Circuit Judge. In these consolidated appeals, defendant Brent Vreeland appeals his convictions on two counts of making false oral and written statements to a federal probation officer, in violation of 18 U.S.C. § 1001(a)(2) and

---

[*] The Honorable S. Thomas Anderson, United States District Judge for the Western District of Tennessee, sitting by designation.

(a)(3), and the revocation of his supervised release. This case presents the novel questions in this circuit of whether a defendant's false statements to a probation officer during the course of a monthly supervisory meeting are protected by the Fifth Amendment privilege against self-incrimination, and whether such statements fall within the "judicial function exception" to prosecution set forth in 18 U.S.C. § 1001(b). We answer "no" to both questions and accordingly affirm.

I.

In January 2005, Vreeland was convicted in federal district court of conspiracy to defraud the United States, stemming from a fraudulent check cashing scheme that spanned from 1999 to 2003. In August 2005, the district court sentenced him to thirteen months of imprisonment and three years of supervised release, and ordered him to pay over $22,000 in restitution.

On February 9, 2008, while still on supervised release, Vreeland committed a home invasion and larceny in Kalamazoo, Michigan. His involvement was confirmed following an investigation and a June 2008 interview with a co-suspect, Rodney Russell, who implicated Vreeland in the crime. Russell, who initially lied to sheriff's authorities about his participation in the home invasion, was charged eventually with the crime and, in March 2009, pled guilty to second-degree home invasion in Kalamazoo County Circuit Court pursuant to a plea agreement requiring him to testify against Vreeland. At Vreeland's bench trial in the present case, Russell testified as to Vreeland's role, their disposal of some of the stolen items in a nearby pond, discussions about getting rid of the getaway vehicle, and their agreement at the time that they would deny knowing each other if questioned by authorities.

United States Probation Officer Nicholas Bobo, who was assigned to supervise Vreeland, testified at the trial about his investigation of the matter. On February 28, 2008, Officer Bobo spoke with a detective from the Kalamazoo County Sheriff's Department and learned that Vreeland's car was linked to a home invasion and that Vreeland was a suspect. Officer Bobo was aware that the detective had scheduled a meeting with Vreeland to discuss the incident. On March 10, 2008, Vreeland,

accompanied by his attorney, appeared for an interview with the detective, but Vreeland refused to answer any questions.

The next day, Vreeland reported to Officer Bobo. Vreeland told Officer Bobo about the interview and informed him that he and Russell were suspects in the home invasion. Vreeland claimed, however, that he did not know Russell. Officer Bobo asked Vreeland what had happened to his grandmother's vehicle, a 1992 Oldsmobile previously noted on monthly supervision reports, and Vreeland indicated that he sold it to a junk yard.[1] Officer Bobo directed him to bring in documentation regarding the car, but Vreeland failed to do so. As a result, Vreeland was arrested for an alleged supervised release violation, but not before Officer Bobo asked him to sign a waiver of hearing on a modification of the terms of his release. Vreeland told Officer Bobo that he needed to talk with his attorney and later responded that he would not sign the waiver.

On March 31, 2008, the day after his arrest, Officer Bobo received a telephone call from Vreeland's attorney, who indicated that he represented Vreeland but stated that he was not familiar with the federal legal system. On April 1, the attorney informed Officer Bobo that he no longer represented Vreeland. Officer Bobo understood this to mean that the attorney no longer represented Vreeland in any capacity whatsoever. New counsel was then appointed to represent Vreeland in federal court for the supervised release violation. At the conclusion of the hearing on April 10, 2008, the district court modified, but did not revoke, Vreeland's supervised release and placed him in a halfway house for five months.

Officer Bobo testified that between April and September of 2008, he had no further conversations with Vreeland about the home invasion. However, Officer Bobo was in continual contact with the investigating detectives, who submitted the case to the Kalamazoo County Prosecutor's Office for review. On August 22, 2008, the prosecutor's office advised Officer Bobo that it would not prosecute Vreeland. Officer

---

[1]A subsequent investigation by Officer Bobo and an FBI agent determined that Vreeland lied, as the car was found abandoned in a parking lot and was later sold in a sheriff's auction to a junk yard in December 2008.

Bobo thereafter began his own investigation and interviewed several witnesses, including Russell. He advised the United States Attorney's Office of his actions and stated that he would be submitting reports for another potential supervised release violation. Officer Bobo met with Vreeland on September 2, 2008, to review his conditions of supervised release and instructed Vreeland to report to him on a monthly basis at his office.

On October 3, 2008, Vreeland appeared at the probation office for his regular monthly meeting with Officer Bobo. By that time, Officer Bobo had concluded, based on his investigation, that Vreeland had violated his supervised release by committing the home invasion. After discussing other matters, Officer Bobo brought up the February 9, 2008, incident. He did not tell Vreeland in advance that he intended to question him about the alleged crime. Officer Bobo told Vreeland that he was a suspect in the home invasion and proceeded to ask him specific questions about the events of that night. Vreeland denied any knowledge of the incident and claimed that he did not know Russell. Officer Bobo then showed Vreeland two photographs of Russell taped to a blank piece of paper, but Vreeland again denied knowing him. Officer Bobo advised Vreeland that he had reason to believe that Vreeland knew Russell, that it was a violation of federal law to make a false statement to a federal officer, and that any false statements would be turned over for further investigation. Still, Vreeland disavowed any familiarity with Russell, and Officer Bobo asked him if he would be willing to make a written statement to that effect. Vreeland agreed and wrote on the piece of paper with the attached photos of Russell that "[t]o my knowledge I do not know this individual. It may be possible that I have seen or met him, but if that is the case, I do not recall the encounter." Officer Bobo then asked Vreeland to make a second written statement that he had never attempted to contact Russell, and Vreeland agreed, writing, "I have never attempted to contact this individual [Russell] to my knowledge." Both statements were initialed, signed, and dated by Vreeland, and Officer Bobo signed and dated the documents as a witness.

Officer Bobo testified that he did not advise Vreeland of his *Miranda* rights because Vreeland was not in custody or under arrest; the office door was open, and Vreeland was free to leave. According to Officer Bobo, Vreeland never invoked his right to remain silent or requested to speak to a lawyer, never indicated that he was represented by a lawyer, never acted confused, and did not refuse to answer any of the questions. Officer Bobo stated that he did not threaten Vreeland with arrest or revocation of his supervised release if he failed to answer his questions, and he further testified that if Vreeland had requested an attorney, he would have honored the request. At the conclusion of the meeting, Officer Bobo told Vreeland that he (Bobo) would be in contact with him, and Vreeland then left of his own accord.

Convinced that Vreeland was lying, Officer Bobo submitted a report to the U.S. Attorney. As a result, on April 23, 2009, Vreeland was indicted on two counts of making false oral and written statements to a federal probation officer, in violation of 18 U.S.C. § 1001(a)(2) and (a)(3). In May 2009, an amended petition seeking revocation of Vreeland's supervised release was filed, alleging five violations of the general condition that "defendant shall not commit another federal, state, or local crime."[2]

In October 2009, the district court conducted a combined bench trial and supervised release hearing. Numerous witnesses – including Russell, Officer Bobo, and county investigators – testified, but Vreeland did not take the witness stand. On November 12, 2009, the district court issued a written decision in which it found Vreeland guilty on both counts of the indictment and all five supervised-release violations. The court sentenced Vreeland to concurrent prison terms of twenty-four months for the false-statement convictions, and to a consecutive term of twenty-four months on the amended revocation petition. Vreeland timely appeals both judgments.

---

[2]In July 2009, Vreeland was arrested and charged in Kalamazoo County Circuit Court with second-degree home invasion, larceny in a building, illegal entry, and failure to stop at the scene of a personal injury accident. The state case was pending at the time of Vreeland's federal trial.

II.

Prior to his bench trial, Vreeland moved to suppress his oral and written statements made to Officer Bobo on the ground that admission of the statements violated his Fifth Amendment right against self-incrimination.  In its written decision, the district court addressed Vreeland's argument and denied the motion, finding Officer Bobo's recitation of the facts and Russell's testimony to be credible.  Specifically, the court determined that:

> [Vreeland] was never in custody so as to implicate his *Miranda* rights.  As Mr. Bobo testified, he had received a telephone call from [Vreeland's attorney], who informed Mr. Bobo that he . . . did not represent Defendant.  Mr. Bobo further testified, the documents show, and the Court finds that Defendant was a frequent visitor to a probation officer, and on the occasion in question spoke with Mr. Bobo in an office where the door was wide open, and Defendant could have walked out of the door if he had wished to do so.  Furthermore, Defendant had been informed of his right not to incriminate himself when he pled guilty to [conspiracy to commit bank fraud in 2005].  Defendant could have invoked his Fifth Amendment and Sixth Amendment rights if he had desired to do so, but he did not.  As a matter of fact, [his] statements to Mr. Bobo were voluntarily made pursuant to a scheme [he] had already cooked up and was urging Mr. Russell to buy into – they did not know each other, they did not break into the apartment, they did not bump into anyone with the car, they did not throw the stolen items in the pond, and they did not conspire to get rid of [Vreeland's] grandmother's car.  Far from being forced to answer any question, [Vreeland] was volunteering lies to keep state and federal officers from charging him with more crimes.

(Footnote omitted.)

In reviewing the denial of a motion to suppress evidence, we review the district court's factual findings for clear error and its legal conclusions de novo.  *United States v. Blair*, 524 F.3d 740, 747 (6th Cir. 2008).  The evidence is to be considered in the light most favorable to the government.  *Id.* at 748.

Citing *Minnesota v. Murphy*, 465 U.S. 420 (1984), Vreeland argues that where, as purportedly here, there is an imminent threat to impose sanctions or penalties such that it forces self-incrimination, the Fifth Amendment is self-executing and does not

require a probationer to invoke it in order to have his admissions suppressed in an ensuing criminal prosecution.  He further contends that his prior invocation of the right to counsel, demonstrated by the appearance of his attorney during the interview with the county detective in March 2008, remained in effect during his October 3, 2008, meeting with Officer Bobo.  We disagree.

The Fifth Amendment to the United States Constitution provides in relevant part that no person "shall be compelled in any criminal case to be a witness against himself." U.S. CONST. amend. V.  "[T]his prohibition not only permits a person to refuse to testify against himself at a criminal trial in which he is a defendant, but also 'privileges him not to answer official questions put to him in any other proceeding . . . where the answers might incriminate him in future criminal proceedings.'"  *Murphy*, 465 U.S. at 426 (quoting *Lefkowitz v. Turley*, 414 U.S. 70, 77 (1973)).  "A defendant does not lose this protection by reason of his conviction of a crime; notwithstanding that a defendant is imprisoned or on probation at the time he makes incriminating statements, if those statements are compelled they are inadmissible in a subsequent trial for a crime other than that for which he has been convicted."  *Id.*

In *Murphy*, the Supreme Court addressed the issue whether an incriminating "statement made by a probationer to his probation officer without prior warnings is admissible in a subsequent criminal proceeding."  *Id*. at 425.  Pursuant to a probation condition that required respondent Murphy to "be truthful with [his] probation officer in all matters," he confessed to a prior rape and murder when questioned about it during the course of a meeting with his probation officer.  *Id.* at 422-24 (internal quotation marks omitted).  The probation officer relayed the information to authorities, and Murphy was indicted for first-degree murder.  *Id*. at 424-25.  Murphy sought to suppress his confession on the ground that it was obtained in violation of the Fifth Amendment. *Id*. at 425.  The Supreme Court reversed the state court's decision suppressing the confession and barring its admission at Murphy's trial.  *Id*.

The Court first observed that "the general obligation to appear [before a probation officer] and answer questions truthfully d[oes] not in itself convert [a

probationer's] otherwise voluntary statements into compelled ones." *Id*. at 427. Except in "certain well-defined situations" such as police custodial interrogations, "a witness [or probationer] confronted with questions that the government should reasonably expect to elicit incriminating evidence ordinarily must assert the privilege rather than answer if he desires not to incriminate himself," and "if he chooses to answer, his choice is considered to be voluntary since he was free to claim the privilege and would suffer no penalty as the result of his decision to do so." *Id*. at 429. The Supreme Court held that "it is clear that Murphy was not 'in custody' for purposes of receiving *Miranda* protection since there was no formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *Id*. at 430 (citation and internal quotation marks omitted).

Nor was Murphy deterred from claiming the privilege against self-incrimination by a reasonably perceived threat of revocation of his probation. *Id*. at 439. The Court explained:

> A state may require a probationer to appear and discuss matters that affect his probationary status; such a requirement, without more, does not give rise to a self-executing privilege. The result may be different if the questions put to the probationer, however relevant to his probationary status, call for answers that would incriminate him in a pending or later criminal prosecution . . . . [I]f the state, either expressly or by implication, asserts that invocation of the privilege would lead to revocation of probation, it would have created the classic penalty situation, the failure to assert the privilege would be excused, and the probationer's answers would be deemed compelled and inadmissible in a criminal prosecution.

*Id*. at 435.

The Supreme Court determined that Murphy's circumstances were "insufficient to excuse [his] failure to exercise the privilege in a timely manner." *Id*. at 437. First, on its face, his probation condition proscribed only false statements and contained no suggestion that his probation was conditioned on his waiver of his Fifth Amendment privilege with respect to further criminal prosecution. *Id.* Second, he "was not expressly informed during the crucial meeting with his probation officer that an assertion of the

privilege would result in the imposition of a penalty." *Id*. at 438. Third, "[t]here [was] no direct evidence that Murphy confessed because he feared that his probation would be revoked if he remained silent." *Id*. at 437. Accordingly, "there [was] no reasonable basis for concluding that [the state] attempted to attach an impermissible penalty to the exercise of the privilege against self-incrimination." *Id*. at 437.

Drawing on *Murphy*, we have held that "the Fifth Amendment privilege against self-incrimination is not self-executing in the context of a meeting with a probation officer." *United States v. Miller*, 910 F.2d 1321, 1326 (6th Cir. 1990) (holding that the defendant's voluntary revelation to his probation officer during a presentence meeting that he regularly purchased cocaine to support his habit, resulting in the probation officer's recalculation of the defendant's base offense level and sentencing range for his drug offense, was not a compelled incrimination); *see also United States v. Humphrey*, 34 F.3d 551, 555 (7th Cir. 1994) ("[U]nless a state overtly threatens to revoke probation in retaliation for the legitimate exercise of the self-incrimination privilege, there is no reasonable basis for a probationer to believe that his Fifth Amendment rights are in jeopardy.") (citing *Murphy*, 465 U.S. at 438).

Vreeland's contention that he was ensnared in the "classic penalty situation" described in *Murphy* – by being given a wrongful choice of either incriminating himself or violating a term of his supervised release by not telling Officer Bobo the truth about his involvement in the home invasion – is without merit for several reasons.

Although further incarceration was possible under Vreeland's terms of supervised release if he failed to "answer truthfully all inquiries by the probation officer," we find no clear error in the district court's factual findings giving credence to Officer Bobo's testimony that he did not threaten arrest or a supervised release violation during the October 3, 2008, meeting. Vreeland was not "in custody." He met with Officer Bobo in the probation office, just as he had done on numerous occasions, and he was free to leave after the meeting. There was no evidence that he felt compelled to answer or that he could not invoke his *Miranda* rights. Indeed, as the district court found, Vreeland was seasoned in the invocation of his right to counsel in his past legal

proceedings, yet he chose not to invoke his Fifth Amendment right during his monthly probation meeting. Officer Bobo neither expressly nor impliedly informed Vreeland that invocation of the privilege would lead to revocation of probation; rather, Vreeland was advised that he could be subject to federal charges if he lied. And lie he did.

"[N]either the text nor the spirit of the Fifth Amendment confers a privilege to lie. '[P]roper invocation of the Fifth Amendment privilege against compulsory self-incrimination allows a witness to remain silent, but not to swear falsely.'" *Brogan v. United States*, 522 U.S. 398, 404 (1998) (alteration in original) (quoting *United States v. Apfelbaum*, 445 U.S. 115, 117 (1980)); *see also United States v. Williams*, No. 07-6358, 2009 WL 579332, at *3 (6th Cir. Mar. 9, 2009) (unpublished) ("[T]he defendant's conviction [for misprision of a felony] did not stem from his silence. Instead, the defendant was convicted because when he chose to speak he lied to the authorities. While the Fifth Amendment may protect the defendant's right to remain silent, it does not give him the right to lie once he chooses to speak.") (citing *Brogan*, 522 U.S. at 404-05).

In a case on all fours with the present circumstances – *United States v. Ballard*, 391 F. App'x 650 (9th Cir. 2010), *cert. denied*, 131 S. Ct. 1583 (2011) – the probationer made false statements to his probation officer during the term of his supervised release, for which he was indicted and convicted under 18 U.S.C. § 1001. He asserted that evidence of the falsehoods should have been suppressed because his Fifth Amendment right against self-incrimination was violated. The Ninth Circuit disagreed, stating:

> No doubt, even those on supervised release retain their Fifth Amendment rights. But that avails Ballard nothing because the Fifth Amendment does not protect lying, and does not protect persons whose statements may merely result in revocation of probation proceedings. The required statements here were, clearly, of the latter variety. The ensuing prosecution . . . was a result of his falsehoods only.

*Id.* at 652 (citation and footnotes omitted) (citing *Murphy*, 465 U.S. at 435 n.7, and *Brogan*, 522 U.S. at 404-05). *Cf. United States v. Melancon*, 662 F.3d 708, 712 (5th Cir. 2011), *cert. denied* 132 S. Ct. 2119 (2012) (holding that even if the defendant prison

inmate was in custody for *Miranda* purposes when he was interviewed by federal officers, his statements were themselves a criminal act and thus would have been admissible at his trial for making and using a false document that was presented to a federal agent and obstruction of justice:  "[The defendant] was not free to lie to the questioners and be absolved from the consequences of those lies because of the absence of warnings.  The exclusionary rule does not act as a bar to the prosecution of a crime where the statements themselves are the crime."); *United States v. Gonzalez-Mares*, 752 F.2d 1485, 1490 (9th Cir. 1985) ("False answers to proper questions asked after conviction would ordinarily be admissible in a prosecution for giving false statements.") (emphasis removed); *United States v. Kirk*, 528 F.2d 1057, 1062 (5th Cir. 1976) ("The Fifth Amendment's prohibition against self-incrimination relates to crimes alleged to have been committed prior to the time when the testimony is sought.  A person, uninformed of his rights, who testifies and thereby incriminates himself of a crime that has been committed, may assert a fifth amendment privilege if prosecuted for that crime, but it has been held that he is not free to falsely testify and commit perjury . . . .  Thus, as a general rule it can be said that no fifth amendment problem is presented when a statement is admitted into evidence which is not confessional in nature, but in and of itself constitutes the crime charged.").

In the present case, Vreeland cannot invoke the Fifth Amendment to protect the falsehoods made to Officer Bobo that resulted in his conviction under 18 U.S.C. § 1001.[3] We therefore conclude that the district court did not err in denying Vreeland's motion to suppress the evidence.

---

[3]*United States v. Saechao*, 418 F.3d 1073 (9th Cir. 2005), upon which Vreeland relies, is inapposite.  There, the Ninth Circuit held that a probationer who *truthfully* admitted to the unlawful possession of a firearm pursuant to a probation condition requiring him to "promptly and truthfully answer all reasonable inquiries" from the probation officer or face revocation of his probation, and who was thereafter charged with a firearm offense, was "compelled" to give incriminating evidence in violation of the Fifth Amendment.  *Id*. at 1081 (internal quotation marks omitted).  Here, Vreeland made false statements, and the resultant prosecution under § 1001(a) was the product of these falsehoods.

III.

The district court found Vreeland guilty of making a false statement and a false writing to his probation officer in violation of 18 U.S.C. § 1001(a)(2) and (a)(3), which states:

> (a) Except as otherwise provided in this section, whoever, in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, knowingly and willfully– . . . (2) makes any materially false, fictitious, or fraudulent statement or representation; or (3) makes or uses any false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or entry; shall be fined under this title, imprisoned not more than 5 years . . . or both.

18 U.S.C. § 1001(a)(2) and (a)(3).

This statute contains an exception to criminal prosecution, and "*does not apply to a party to a judicial proceeding, or that party's counsel, for statements, representations, writings or documents submitted by such party or counsel to a judge or magistrate in that proceeding.*" 18 U.S.C. § 1001(b) (emphasis added). This "judicial function exception" has three requirements: "[The defendant] must show that (1) he was a party to a judicial proceeding, (2) his statements were submitted to a judge or magistrate, and (3) his statements were made 'in that proceeding.'" *United States v. McNeil*, 362 F.3d 570, 572 (9th Cir. 2004).

Vreeland renews his argument made to the district court that his false statements were submitted in the course of the district court's adjudicative function and thus were not subject to the reach of § 1001(a). He contends that he made the statements to Officer Bobo in a matter directly relating to his supervised release and, when this occurred at the meeting on October 3, 2008, the nature of the investigation was such that it was inevitable that the statements would be submitted to the court. Vreeland argues that at this point in time, regardless of whether he admitted or denied his involvement in the home invasion, Officer Bobo was conducting an investigation predetermined to lead to

a violation proceeding and, therefore, the statements were made by a party to a judicial proceeding.

The district court concluded otherwise, finding as a matter of law "that [the] statements made to [Officer] Bobo by Defendant on October 3, 2008, were not statements made or documents submitted to a magistrate or judge"; that "a meeting between a probation officer and a defendant under supervision is not a 'judicial proceeding' within the meaning of the statute"; and that Officer Bobo "exercised his own discretion in seeking to revoke Defendant's parole, and [therefore] 18 U.S.C. § 1001(b) does not apply to the facts of this case because [Officer] Bobo was not acting as an agent of the Court." We agree with the district court.

"'A matter requiring statutory interpretation is a question of law requiring de novo review, and the starting point for interpretation is the language of the statute itself.'" *United States v. Brown*, 639 F.3d 735, 737 (6th Cir. 2011) (quoting *United States v. Batti*, 631 F.3d 371, 375 (6th Cir. 2011)). "When a plain reading leads to ambiguous or unreasonable results, a court may look to legislative history to interpret a statute." *Roth v. Guzman*, 650 F.3d 603, 614 (6th Cir. 2011) (citation and internal quotation marks omitted).

We have not had occasion to address the application of the judicial function exception to a probationer's false statements made to a probation officer, and the two sister circuits that have confronted the issue are in conflict. Both of these cases arose in the context of statements made during the presentence investigation process.

In *United States v. Horvath*, 492 F.3d 1075 (9th Cir. 2007), a panel majority of the Ninth Circuit held that § 1001(b) immunized a defendant's false statement made to a probation officer during the defendant's presentence interview. Defendant Horvath falsely told the probation officer that he had served in the Marine Corps, a representation incorporated into the presentence report ("PSR") and relied upon by the district court in imposing a lenient sentence of probation. *Id*. at 1076. More than four years later, the government determined that Horvath was never a United States Marine and charged him with a violation of § 1001(a). He entered a conditional guilty plea and filed a motion to

dismiss the indictment, arguing that § 1001(b) prevented his prosecution as a matter of law. *Id*. at 1077. The district court denied Horvath's motion, but on appeal, the Ninth Circuit held that Horvath's statement fell within the exception in § 1001(b) and reversed the district court's ruling. *Id*. at 1082.

The court reasoned that "[b]ecause [Federal Rule of Criminal Procedure] 32 required the probation officer to submit Defendant's false statement of personal history to the judge, and because the probation officer exercised no discretion in doing so, he was acting as a conduit between Defendant and the judge."**4** *Id*. at 1080. The court underscored the "limited reach" of its holding, emphasizing that "[a] defendant's statement to a probation officer is protected under § 1001(b) only if the law requires the probation officer to include the statement in the PSR and submit the PSR to the court. In these circumstances, the statement is submitted (albeit indirectly) by the defendant to a judge in a judicial proceeding." *Id*. at 1081.

In her dissent in *Horvath*, Judge Rymer opined that "nothing in Rule 32 makes the probation officer a courier pigeon." *Id.* at 1082 (Rymer, J., dissenting). "In the capacity relevant here, preparation of a presentence report (PSR), a probation officer is an investigator and advisor who must gather, sort, and distill information that Federal Rule of Criminal Procedure 32 requires . . . . For sure, the [PSR] is submitted to a judge. Yet if the defendant submits to an interview, and makes a statement, he makes the statement to a probation officer; if he lies, he lies *to* the *probation officer*, not 'to the judge.'" *Id*. She further found it

> hard to believe that Congress intended the exception for submissions "to a judge" to encourage those convicted of federal crimes to fabricate tales to a probation officer for the purpose of influencing a more favorable sentence. While Congress obviously did intend to allow some false statements, representations, writings, and documents to be made to a judge in the course of adversarial litigation to avoid chilling advocacy on the margin between pushing the envelope and being misleading and

---

**4**Rule 32 provides in pertinent part that "[t]he probation officer must conduct a presentence investigation and submit a report to the court before it imposes sentence," and that "[t]he presentence report must also contain . . . the defendant's history and characteristics." Fed. R. Crim. P. 32(c)(1) and (d)(2)(A).

lying, it did not immunize falsehoods altogether even in the judge's arena as it drew a line at knowingly making a false material statement under oath. 18 U.S.C. § 1623. Additionally, the adversary system, counsels' ethical obligations, and other means available to judicial officers kick in to further truth-seeking in the courtroom. Similar balances do not apply in the probation officer's arena. Statements to probation officers are not made under penalty of perjury and the process is not adversarial. Absent § 1001, there are scant incentives for truth-speaking.

*Id*. at 1083-84.[5]

In *United States v. Manning*, 526 F.3d 611 (10th Cir. 2008), a panel majority of the Tenth Circuit addressed the same issue, but rejected the *Horvath* majority's logic and, instead, found Judge Rymer's dissent to be the "better approach." *Id*. at 619. The defendant was prosecuted for making a false statement under § 1001(a) when he failed to divulge financial assets to his probation officer, who was calculating the defendant's net worth for a PSR pertaining to the defendant's underlying conviction of misappropriation by a fiduciary. *Id.* at 612-13. The Tenth Circuit adopted Judge Rymer's point of view and held that the judicial function exception did not apply because the defendant's false statement was not "submitted to the judge" within the meaning of § 1001(b). *Id.* at 619-20. Acknowledging that it was "a close and difficult case" because of the varied nature of a probation officer's duties, the court delved into the legislative history of § 1001(b) and concluded that it "[could not] hold that Congressional intent encompassed allowing a defendant to conceal resources when such evidence is critical to the final judicial decision, at which time the advocates can have their say protected by § 1001(b)." *Id*. at 621. The underpinning of the court's holding was its belief that the "[presentence] process involves the probation officer's exercise of his discretion, and not a mere transmission of information." *Id*. at 619.

Unlike *Horvath* and *Manning*, the present case does not involve false statements made to a probation officer during the presentence phase of the case, and we do not purport to decide in that context which of these decisions states the better point of view.

_____

[5]The full complement of the Ninth Circuit subsequently denied the government's petition for rehearing en banc, but not without the dissent of seven judges. *See United States v. Horvath*, 522 F.3d 904 (9th Cir. 2008).

However, we find the Tenth Circuit's characterization of the probation officer's function as more than merely a "conduit" to the trial court to be particularly apropos here, where a probation officer is overseeing a defendant's compliance with the terms of supervised release. In this setting, there is no question that a probation officer "has a separate role to play as an investigator and truth-finder." *United States v. Horvath*, 522 F.3d 904, 913 (9th Cir. 2008) (Kozinski, C.J., dissenting) (order denying petition for rehearing en banc). The probation officer is broadly charged with, inter alia, "keep[ing] informed . . . as to the conduct and condition of a probationer or a person on supervised release . . . and report[ing] his conduct and condition to the sentencing court," "us[ing] all suitable methods, not inconsistent with the conditions specified by the court, to aid a probationer," "be[ing] responsible for the supervision of any probationer or a person on supervised release who is known to be within the judicial district," "keep[ing] informed concerning the . . . compliance with any condition of probation . . . and report[ing] thereon to the court," and "perform[ing] any other duty that the court may designate." 18 U.S.C. § 3603(2)-(4), (7), (10). In addition, when a probationer violates the conditions of his supervised release, a probation officer has the discretion to seek revocation of the probationer's parole. 28 C.F.R. § 2.48.

In this capacity, probation officers manage defendants under their supervision largely without the involvement of the judge, who does not normally review the probation officer's monthly reports, financial statements, and other paperwork unless there is a specific problem, a violation, or a termination of supervision. "Equating lying to a probation officer with lying to a judge overlooks the differences in the roles of each person . . . . [A judge] does not conduct his own investigation; he does not interview witnesses outside of court; he does not independently verify information given to him. Instead, he must rely on the probation officer to investigate and verify information." *Horvath*, 522 F.3d at 912 (Bea, J., dissenting). Applying this rationale to the present case, we conclude that Vreeland's false statements to Officer Bobo were not "submitted . . . to a judge" as called for under § 1001(b).

More importantly, we do not tacitly assume, as did the courts in *Horvath* and *Manning*, that a meeting between a probation officer and a defendant under supervision is a "judicial proceeding" within the meaning of § 1001(b).[6] We hold that it is not.

The legislative history of the judicial function exception indicates that it was enacted by Congress in 1996 and added to § 1001 for the purpose of

> codify[ing] the judicial function exception which has long been recognized by many Federal courts as necessary to safeguard from the threat of prosecution statements made in the course of adversarial litigation. Allowing the criminal penalties of section 1001 to apply to statements made in the course of adversarial litigation would chill vigorous advocacy, thereby undermining the adversarial process. The exception is consistent with the [Supreme] Court's reasoning in [*United States v. Bramblett*, 348 U.S. 503 (1955), and *Morgan v. United States*, 309 F.2d 234 (D.C. Cir. 1962)], and subsequent case law, which consistently distinguished the adjudicative from the administrative functions of the court, exempting from section 1001 only those communications made to the court when it is acting in its adjudicative or judicial capacity, and leaving subject to section 1001 those representations made to the court when it is functioning in its administrative capacity.

> * * *

> Consequently, consistent with *Bramblett*, *only those representations made to a court when it is acting in its administrative or "housekeeping" capacity are within the scope of section 1001. Such representations would include* any filings not related to a proceeding before the court, such as submissions related to bar membership, and would also include the submission of information to another entity within the judicial branch, such as the probation service.

---

[6] *See Manning*, 526 F.3d at 615 ("[T]here is no debate that Mr. Manning was a party to a judicial proceeding and that he made a statement during that proceeding. The question is whether [his] failure to mention to [the probation officer] the existence of the 401(k) account, which in turn [the probation officer] omitted from the PSR submitted to the court, was a false statement 'submitted . . . to a judge' [under § 1001(b)]."); *Horvath*, 492 F.3d at 1077 ("The parties – and we – agree that the first and third requirements are met: Defendant was a party to a judicial proceeding and made his statement in that proceeding. The only issue in dispute is the second requirement: whether Defendant's false statement to the probation officer, which was submitted to the judge in the PSR, qualifies as having been submitted by [a] party . . . to a judge."); *cf. McNeil*, 362 F.3d at 572-73 (holding that the district court's inquiry into the defendant's financial status to determine if he qualified for court-appointed counsel was a "judicial proceeding" under § 1001(b) because "every point between the indictment and the disposition [is] considered part of the 'judicial proceeding'").

H. R. Rep. No. 104-680, 104th Cong., 2nd Sess. 1996, as reprinted, 1996 U.S.C.C.A.N. 3935, 3937-38, 3943 (footnotes omitted) (emphasis added).

Very clearly, then, a meeting between a probation officer and a defendant under supervision is not a "judicial proceeding" protected by § 1001(b) because it serves an administrative, not an adjudicative, function.

Two pre-enactment cases that are representative of the common law codified by Congress in § 1001(b) support our conclusion. In *United States v. Inserra*, 34 F.3d 83 (2d Cir. 1994), the defendant falsified his monthly probation supervision reports by indicating that he neither owned nor drove any vehicles, when in fact he both owned and drove a 1978 Porsche worth $25,000. *Id*. at 86. The court rejected the defendant's claim that his false statements fell within the judicial function exception, stating:

> [The defendant] argues that the false statements in this case were not made in an administrative context because the court was acting in a judicial capacity in ascertaining whether [he] should have the right to continued liberty. However, there is a clear distinction between statements made to a sentencing court and those made to the Probation Office by a probationer. Unlike the role of the court in rendering an appropriate sentence, the duties of a probation officer in supervising a probationer clearly are administrative in nature, *see* 18 U.S.C. § 3603, and have no bearing on the court's adjudicative function, *cf. United States v. Mayer*, 775 F.2d 1387, 1391 (9th Cir. 1985) (per curiam) (noting that statement made to probation officer during presentence interview does not fall within adjudicative function exception because interview itself was not adjudicative). Accordingly, the false statements made by [the defendant] to the Probation Office do not fall within the adjudicative function exception and are subject to prosecution under the provisions of section 1001.

*Id.* at 88.

In *United States v. Grimes*, 54 F.3d 489 (8th Cir. 1995), the defendant on supervised release falsely indicated on his monthly supervision reports to the Probation Office that he had not had contact with law enforcement officials and had not committed any crimes, when he in fact had been twice arrested and convicted of shoplifting. *Id*. at

490. Finding the reasoning of the Second Circuit in *Inserra* to be "convincing," the Eighth Circuit concluded that:

> [Section] 1001 may be applied to false statements in a monthly supervision report because such statements do not relate to the court's adjudicative function. Statements in supervision reports are used to track compliance with release conditions and to ensure regular contact with the probation office. The function of the report is predominantly supervisory and administrative, rather than adjudicative. Although the probation office may consider the answers given on the report in determining whether to seek modification or revocation of supervised release, the ultimate decision to modify or revoke supervised release is made by the court, not the probation office.

*Id.* at 492.

Section 1001(b) now embodies the common-law dichotomy between administrative and adjudicative functions drawn in these and other pre-1996 cases. Taking into consideration the legislative history of § 1001 and relevant precedents, we hold that the false statements made by Vreeland to Officer Bobo during the supervisory meeting do not enjoy the protection of § 1001(b) because the meeting was administrative in nature and was not a "judicial proceeding" as contemplated by Congress. To conclude otherwise would frustrate the probation process and contravene the purpose of § 1001.

For these reasons, the district court did not err in refusing to dismiss the indictment and associated supervised release violations. Vreeland cannot seek shelter in the judicial function exception.

IV.

The judgments of the district court are affirmed.