NOT RECOMMENDED FOR PUBLICATION
File Name: 21a0188n.06
Case No. 20-5023

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
| | ) | THE EASTERN DISTRICT OF |
| CORNELIUS EDRINGTON, | ) | KENTUCKY |
| | ) | |
| Defendant-Appellant. | ) | |

FILED
Apr 14, 2021
DEBORAH S. HUNT, Clerk

BEFORE: GIBBONS, COOK, and LARSEN, Circuit Judges.

COOK, Circuit Judge. Cornelius Edrington appeals the district court's denial of his motion to suppress statements he made during a meeting with his probation officer and two Drug Enforcement Administration agents. We AFFIRM.

**I.**

In 2018, Edrington found himself on supervised release from a prior felony drug conviction. The standard conditions of that release required Edrington to report to his probation officer and truthfully answer her inquiries.

During his term of supervision, federal authorities identified Edrington as a participant in a conspiracy to distribute marijuana. They also suspected that Edrington knew about opioid distribution in the Cincinnati area. As a result, two DEA agents asked Edrington's probation

officer to summon him for a meeting. She agreed, directing Edrington to report to the probation office "to turn in monthly supervision reports that she was missing."

After he arrived at the office with his infant son, Edrington's probation officer directed him to an interior conference room. The probation officer and the DEA agents entered the room shortly after Edrington. At the outset, one of the agents told Edrington that he was not under arrest and was free to leave. The agents then questioned Edrington about the marijuana and opioid cases, explaining that they hoped to gain his cooperation in the latter. After fifteen or twenty minutes, an agent gave his card to Edrington and asked him to let the agent know within four days if he planned to cooperate in the opioid case. Edrington then left with his son.

A federal grand jury later indicted Edrington for his role in the marijuana conspiracy. Edrington moved to suppress the statements he made during the meeting, claiming both that the agents subjected him to custodial interrogation without providing *Miranda* warnings and that he gave his statements involuntarily. The district court denied the motion after holding a hearing, concluding that "there was nothing about the interview that would lead a reasonable person to believe they were under arrest" and that Edrington made his statements voluntarily. Edrington then entered a conditional guilty plea, reserving his right to challenge the suppression decision that he now appeals.

**II.**

"When reviewing the district court's decision regarding a motion to suppress, we review its factual findings for clear error and its legal conclusions de novo." *United States v. Levenderis*, 806 F.3d 390, 399 (6th Cir. 2015) (citation omitted). "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the

definite and firm conviction that a mistake has been committed." *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948).

## III.

Edrington first argues that the district court should have suppressed his statements because he never received *Miranda* warnings. *See Miranda v. Arizona*, 384 U.S. 436, 478–79 (1966). "*Miranda* warnings are required only where there has been such a restriction on a person's freedom as to render him 'in custody.'" *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977) (per curiam). To make that determination, "courts consider 'all of the circumstances' surrounding the encounter, with 'the ultimate inquiry' turning on whether 'a formal arrest' occurred or whether there was a 'restraint on freedom of movement of the degree associated with a formal arrest.'" *United States v. Panak*, 552 F.3d 462, 465 (6th Cir. 2009) (quoting *Stansbury v. California*, 511 U.S. 318, 322 (1994)). We review several factors, including "(1) the location of the interview; (2) the length and manner of the questioning; (3) whether there was any restraint on the individual's freedom of movement; and (4) whether the individual was told that he or she did not need to answer the questions." *United States v. Hinojosa*, 606 F.3d 875, 883 (6th Cir. 2010).

Edrington grounds his claim of custody principally on the terms of his supervised release. Because those terms required him to attend the meeting and to truthfully answer the probation officer's inquiries, Edrington maintains that the agents should have administered *Miranda* warnings before questioning him. In *Minnesota v. Murphy*, however, the Supreme Court rejected that argument. 465 U.S. 420 (1984). There, a probation officer summoned the defendant and questioned him about a rape and murder. *Id.* at 423–24. The Court concluded that "Murphy was not in custody for purposes of receiving *Miranda* protection since there was no formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *Id.* at 430

(quotations and citation omitted). Though the Court acknowledged that "the probation officer could compel Murphy's attendance and truthful answers," those requirements did not "transform[] a routine interview into an inherently coercive setting." *Id.* at 431; *see also United States v. Vreeland*, 684 F.3d 653, 659–60 (6th Cir. 2012).[1] Because *Murphy* teaches that the terms of supervised release did not relieve Edrington of his obligation to invoke his Fifth Amendment privilege, we turn to the four custody factors.

***Location of the Interview***. As the Court explained in *Murphy*, questioning at a probation office contrasts sharply with the coercive atmosphere of custodial interrogation. 465 U.S. at 433. Probation officers generally "arrange[] . . . appointment[s] at a mutually convenient time," making it "unlikely" that a suspect will believe "that he has no choice but to submit to the officers' will and to confess." *Id.* And Edrington's regular meetings at the probation office—including in its interior conference rooms—"should have served to familiarize him" with his surroundings "and to insulate him from psychological intimidation that might overbear his desire to claim the privilege." *Id.*

Adding to these differences, Edrington brought his infant son to the probation office—hardly conjuring "the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*." *Howes v. Fields*, 565 U.S. 499, 509 (2012). We therefore conclude that the location of the interview cuts against Edrington. *See, e.g.*, *Vreeland*, 684 F.3d at 660 (interview at probation office not custodial); *Cranley*, 350 F.3d at 619–20 (same); *United States v. Nieblas*,

---

[1] Edrington suggests that *Murphy* "is totally distinguishable" because "there were no police agents whatsoever present during that interview." While the presence of police may increase the coerciveness of the interview, their presence alone does not automatically render the interrogation custodial. *United States v. Cranley*, 350 F.3d 617, 620 (7th Cir. 2003).

115 F.3d 703, 705 (9th Cir. 1997) (same); *United States v. Howard*, 115 F.3d 1151, 1154–55 (4th Cir. 1997) (same); *United States v. Rainey*, 404 F. App'x 46, 56 (7th Cir. 2010) (same).

***Length and Manner of Questioning.*** The meeting lasted only fifteen to twenty minutes, "well within the window of time that we traditionally consider to be a noncustodial interview." *United States v. Saylor*, 705 F. App'x 369, 374 (6th Cir. 2017).[2] During that brief period, the agents focused the discussion on Edrington's potential cooperation in the opioid investigation—not the evidence against him in the marijuana investigation. Also, as the district court found, the "consensual" tone and tenor of the meeting weighs against a finding of custody. *See, e.g.*, *United States v. Cantie*, 839 F. App'x 998, 1003 (6th Cir. 2021) (rejecting claim of custody when the "questioning was not hostile or coercive"); *United States v. Abdi*, 827 F. App'x 499, 507 (6th Cir. 2020) (when questions were "non-accusatory"); *United States v. Martinez*, 795 F. App'x 367, 374 (6th Cir. 2019) (when "the tone of the conversation remained calm and noncombative").

Resisting this conclusion, Edington notes that the probation officer gave an apparently pretextual reason for the meeting: to turn in missing supervision reports. That fact, however, "does not create the level of compulsion or coercion that turns non-custody into a custodial situation." *United States v. Malcolm*, 435 F. App'x 417, 421 (6th Cir. 2011); *see also, e.g.*, *Martinez*, 795 F. App'x at 373 (finding that agents' ruse in summoning defendant for interview "weighs only modestly in favor of custody").

---

[2] We find little value in Edrington's appeal to *United States v. Barnes*, where the interrogation lasted approximately two hours. 713 F.3d 1200, 1204 (9th Cir. 2013) (per curiam). Unlike the meeting at issue here, the interrogation in *Barnes* took place behind a locked door after the defendant had been searched. *Id.* The FBI agents in *Barnes* did not open questioning by informing the defendant that he was free to leave, *see id.*, as the DEA agents did for Edrington. Moreover, *Barnes* did not address *Murphy*'s holding that a similar probation meeting was non-custodial.

***Restraints on Freedom of Movement.*** Also weighing against custody, the plainclothes agents made no effort to restrain Edrington, such as by displaying weapons or handcuffs or by blocking access to the door. *See, e.g.*, *Levenderis*, 806 F.3d at 400; *Malcolm*, 435 F. App'x at 421; *United States v. Brooks*, 379 F. App'x 465, 473 (6th Cir. 2010). "Since [Edrington] was not physically restrained and could have left the office, any compulsion he might have felt from the possibility that terminating the meeting would have led to revocation of [supervised release] was not comparable to the pressure on a suspect who is painfully aware that he literally cannot escape a persistent custodial interrogator." *Murphy*, 465 U.S. at 433.

***Warnings.*** As the district court recognized, neither the probation officer nor the agents informed Edrington that he could decline to answer the agents' questions. But "we have never held that [this] is a necessary condition (as opposed to a frequently sufficient condition) before officers may question an individual in a non-custodial setting." *Panak*, 552 F.3d at 467. "It would be strange, indeed, to say that a telltale sign of whether an individual must be Mirandized is whether the officer gave the individual one of the *Miranda* warnings—that [he] need not answer the questions." *Id.* What's more, the district court found that the agents informed Edrington that he was not under arrest, "an important factor in finding that the suspect was not in custody." *United States v. Salvo*, 133 F.3d 943, 951 (6th Cir. 1998). Given this fact, we accord little weight to their failure to inform him that he did not need to answer their questions.

The district court rightly determined this brief, consensual meeting with the agents to have been non-custodial regardless of Edrington's supervised-release status.

## IV.

Edrington also claims that the terms of his supervised release rendered his statements involuntary. "The general rule that the privilege must be claimed when self-incrimination is

threatened has also been deemed inapplicable in cases where the assertion of the privilege is penalized so as to 'foreclos[e] a free choice to remain silent . . . .'" *Murphy*, 465 U.S. at 434 (alteration in original) (quoting *Garner v. United States*, 424 U.S. 648, 661 (1976)). In *Murphy*, the Court noted that a probation officer's questions about matters relevant to a pending or future criminal prosecution could present such a scenario. "[I]f the state, either expressly or by implication, asserts that invocation of the privilege would lead to revocation of probation," the Court explained, "it would have created the classic penalty situation, the failure to assert the privilege would be excused, and the probationer's answers would be deemed compelled and inadmissible in a criminal prosecution." *Id.* at 435. Because the probation officer did not take that "extra, impermissible step" of threatening Murphy with revocation for invoking the privilege and because Murphy's probation conditions did not create a penalty situation on their face, the Court held the statements admissible. *Id.* at 436–37; *see also Vreeland*, 684 F.3d at 660 (rejecting Fifth Amendment claim when probation officer "did not threaten arrest or a supervised release violation" during meeting); *Cranley*, 350 F.3d at 622 (same).

We have already held that a supervision condition consisting of language identical to Edrington's did not create a penalty situation. *See Vreeland*, 684 F.3d at 660; *see also* U.S.S.G. § 5D1.3(c)(4) cmt. n.1 ("[A] defendant's legitimate invocation of the Fifth Amendment privilege against self-incrimination in response to a probation officer's question shall not be considered a violation of this condition."). The district court specifically found that "[n]o one told [Edrington] that he was going to be indicted in connection with the marijuana case or threatened him in any way during the May 31 meeting." Edrington identifies no clear error in that finding. *See Vreeland*, 684 F.3d at 660. And we cannot derive an implicit threat of revocation based on the probation officer's mere presence during the agents' questioning. Because neither the probation officer nor

the agents took the "extra, impermissible step" of threatening Edrington, the court is without grounds to conclude that he made his statements involuntarily. *Murphy*, 465 U.S. at 436; *see Vreeland*, 684 F.3d at 660.

## V.

We AFFIRM.