RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 16a0091p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

No. 14-3723

ANGELIQUE BANKSTON,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 1:13-cr-00166-1—David D. Dowd, Jr., District Judge.

Argued: December 9, 2015

Decided and Filed: April 14, 2016

Before: STRANCH, DONALD, and LIPEZ,[*] Circuit Judges.

_____

## COUNSEL

**ARGUED:** Nadia Wood, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Columbus, Ohio, for Appellant. Mark S. Bennett, UNITED STATES ATTORNEY'S OFFICE, Cleveland, Ohio, for Appellee. **ON BRIEF:** Nadia Wood, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Columbus, Ohio, for Appellant. Mark S. Bennett, UNITED STATES ATTORNEY'S OFFICE, Cleveland, Ohio, for Appellee.

---

[*]The Honorable Kermit V. Lipez, Circuit Judge for the United States Court of Appeals for the First Circuit, sitting by designation.

1

———————————

**OPINION**

———————————

LIPEZ, Circuit Judge.  Asserting that her trial on twenty-three fraud-related charges was flawed by numerous errors, Defendant-Appellant Angelique Bankston asks us to vacate all of her convictions and remand for a new trial.  In particular, she argues that (1) her waiver of counsel was invalid, (2) she was improperly charged in count 23 with making false statements to a judge in violation of 18 U.S.C. § 1001, (3) the trial proceedings were procedurally deficient due to judicial bias, prosecutorial misconduct, and ineffective assistance of counsel, and (4) the evidence was insufficient to support her convictions for wire and mail fraud.  She further contends that, even if we reject her claims of trial error, she is entitled to resentencing.

Having carefully considered her claims, we conclude that only her claims of error as to the count 23 conviction and sentencing have merit.  Therefore, we **VACATE** Bankston's conviction on count 23 of making false statements in violation of 18 U.S.C. § 1001, **AFFIRM** her convictions on all other counts, and **REMAND** the case for resentencing.

**I.**

On August 28, 2013, Bankston was charged in a twenty-three-count Second Superseding Indictment with committing wire fraud, mail fraud, bank fraud, money laundering, identity theft, and a false statement offense in connection with three separate fraudulent schemes that occurred between March 2011 and June 2012.  Unlike the previous indictments, this superseding indictment (and the final and operative Third Superseding Indictment) included count 23, which charged Bankston with making false statements in matters within the jurisdiction of the judiciary, based on a letter she wrote to the district judge accusing the government of planting evidence in her home.

Although Bankston asks that we vacate her convictions on every count, the fraudulent activity pertinent to her claims on appeal concerns primarily one of the three fraudulent schemes—the so-called "Citizens Bank and Lending Club Scheme."  Hence, we limit our recitation of the facts to that particular scheme and provide additional details as necessary in our

analysis.  Similarly, we briefly sketch out the procedural background in this section, reserving a more complete account of the trial proceedings until our discussion of Bankston's claims.

All of Bankston's fraudulent schemes followed one fundamental pattern.  She unlawfully obtained the personal identification information of individuals and used it to defraud commercial banks and the state and federal government.  In the Citizens Bank and Lending Club Scheme, she instructed her co-conspirator, Jocelyn Hale, to open an account at Citizens Bank in the name of Rachelle Butler—whose personal identifiers Bankston had illegally obtained—at the bank's branch office in Erie, Pennsylvania.  When opening the account, Hale also opened a Citizens Bank credit card in Butler's name.  Bankston then deposited funds in Butler's Citizens Bank account, which she acquired in part from a fraudulent Lending Club loan application that she had filled out online using Butler's identifiers.  Bankston then instructed Hale to withdraw a portion of these funds in the form of two cashier checks.  Bankston and Hale failed to cash those checks, however, and a dispute arose shortly thereafter over Bankston's refusal to pay Hale as promised.

On September 5, 2012, Postal Inspector L.E. Macek searched Bankston's home pursuant to a warrant.  While the search uncovered certain evidence of Bankston's fraudulent schemes, such as a list of individuals whose identifiers she had obtained unlawfully, most of the search involved the postal inspector asking Bankston a series of questions about her acquaintance with a co-conspirator and her reasons for placing mail holds.[1]  Bankston answered these questions, having signed a waiver of her *Miranda* rights.

Before trial, Bankston wrote a letter to the district judge complaining of a disagreement with her attorney about trial strategy.  Bankston wanted to present as a defense her theory that the evidence of the fraudulent schemes that was recovered from her home had been planted by a federal agent.  Specifically, she claimed that Postal Inspector Macek, who performed the search of her home, was in fact the same person as one of the two local police officers who had visited her home several months earlier on a separate investigation.  Bankston explained in her letter that her attorney's refusal to present the planted evidence theory as a defense resulted in a breakdown of the attorney-client relationship.

---

[1]Bankston placed mail holds on certain individuals whose identities she had obtained in order to intercept various documents and checks that she had arranged to be sent to them.

The district court treated Bankston's letter as a pro se motion to suppress the evidence and held a suppression hearing. The court also appointed new counsel to represent Bankston. At the suppression hearing, the two local police officers testified that they were not aware of the federal investigation of Bankston when they visited Bankston's home earlier that year on a separate investigation, and that they did not enter her residence or plant evidence. Instead, they left a card in the door for Bankston to call. Macek testified that he was not aware of the local police investigation of Bankston, and he was not at Bankston's home when the local police officers paid a visit earlier that year. The district court denied Bankston's motion to suppress.

Meanwhile, before the suppression hearing, the government filed the Second Superseding Indictment that included the count 23 false statement charge. That charge relied solely on Bankston's letter as the factual basis for the offense, excerpting, for instance, portions of the letter in which Bankston explained her planted evidence theory. The indictment also stated that, in addition to deceiving the district court by presenting the planted evidence theory, the letter "caused the FBI and IRS agents assigned to the case to perform additional investigation."

Trial commenced on November 5, 2013. During voir dire, Bankston's attorney informed the district court that Bankston wished to proceed pro se. While the district judge was initially reluctant to allow Bankston to represent herself, the judge ultimately conducted an inquiry to determine if Bankston's decision to waive her right to counsel was knowing and intelligent. The court found that it was, and Bankston remained pro se throughout the trial. The jury found Bankston guilty on all twenty-three counts.

At the sentencing hearing, Bankston was again represented by an attorney. After hearing argument on various proposed enhancements to the base offense level, the court determined Bankston's base offense level to be 27, with a criminal history category of VI, which resulted in the guideline range of 130 to 162 months. The court sentenced Bankston to 144 months on counts other than the aggravated identity theft counts, added a mandatory two-year consecutive sentence for Bankston's aggravated identity theft convictions, and imposed a total sentence of 168 months. This appeal followed.

**II.**

Bankston raises five arguments on appeal.  First, she argues that her waiver of counsel was invalid because the district court failed to conduct a full *Faretta* inquiry, as required by *United States v. McDowell*, 814 F.2d 245 (6th Cir. 1987).  Second, Bankston contends that count 23 in the indictment was defective because the underlying conduct for the charge—here, writing a letter to the district judge as part of a criminal defense—is explicitly exempted from criminal liability under the statute.  Third, and relatedly, Bankston argues that there were numerous errors throughout the trial relating to count 23, which, individually and collectively, warrant a new trial on all counts.  These alleged errors include:  ineffective assistance of counsel in failing to object to or move to dismiss count 23; prosecutorial misconduct in overzealously pursuing that charge; and judicial bias resulting from the district judge's failure to recuse himself, despite the fact that he was the recipient of Bankston's letter and hence a victim of the false statement crime.  Fourth, Bankston argues that her convictions on counts 16 (wire fraud) and 18 (mail fraud) should be vacated because the government failed to prove essential elements of the crimes in those respective counts—namely, the use of an interstate wire communication for wire fraud and the use of the mails for mail fraud.  Finally, Bankston argues that the district court committed a series of errors in sentencing, such as incorrectly calculating the base offense level and failing to provide an explanation for departure in the criminal history category, which require resentencing. We address each claim in turn.

**A.  Waiver of Counsel**

The parties agree that plain error review applies to the claim that Bankston's waiver of counsel was invalid.  Hence, in order to prevail, Bankston must show that the district judge's *Faretta* inquiry constituted a plain error that "affect[ed] [her] substantial rights" and that implicated the "fairness, integrity, or public reputation of judicial proceedings." *Johnson v. United States*, 520 U.S. 461, 466–69 (1997) (internal quotation marks omitted); *see also United States v. Oliver*, 397 F.3d 369, 375–76 (6th Cir. 2005).

1. **Legal Principles**

The legal standards governing the validity of waiver of counsel are well-developed, though they are not without complexities in application. In *Faretta v. California*, 422 U.S. 806, 819 (1975), the Supreme Court held that the Sixth Amendment right to counsel has implicit within it a right to self-representation. Recognizing the advantages of legal representation, the *Faretta* Court required, however, that, "in order to represent himself, the accused must knowingly and intelligently forgo those relinquished benefits." *Id.* at 835 (internal quotation marks omitted). Thus, while "a defendant need not himself have the skill and experience of a lawyer in order competently and intelligently to choose self-representation, he should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that he knows what he is doing and his choice is made with eyes open." *Id.* (internal quotation marks omitted). Following the Court's decision in *Faretta*, numerous circuits addressed the question of what type of "record" is necessary to establish that a defendant's waiver of counsel was "knowing and intelligent." *See, e.g.*, *United States v. Hafen*, 726 F.2d 21, 25–26 (1st Cir. 1984); *Richardson v. Lucas*, 741 F.2d 753, 756–57 (5th Cir. 1984); *United States v. Kimmel*, 672 F.2d 720, 721–22 (9th Cir. 1982); *United States v. Bailey*, 675 F.2d 1292, 1297–1302 (D.C. Cir. 1982).

This Circuit did so in *McDowell*, 814 F.2d at 248–50. There, we acknowledged the "difficult position" of a district judge in determining whether a waiver is knowing and intelligent. *Id.* at 248. "An overprotective judge who refuses to allow a defendant to jeopardize his own defense may be reversed, and a judge who does not make a copious inquiry into the thought process of the accused (which may themselves be characterized as trial strategy) is subject to an appeal . . . ." *Id.* at 248–49. To mitigate such concerns, we identified "the nature of the inquiry to be made and the procedure to be followed" when a criminal defendant expresses a wish to represent himself. *Id.* at 250. A model inquiry, we noted, is one provided in the *Benchbook for U.S. District Court Judges* ("Bench Book"). *Id.* We then instructed the district courts in our circuit that:

> In the future, whenever a federal district judge in this circuit is faced with an accused who wishes to represent himself in criminal proceedings, the model inquiry or one covering the same substantive points along with an express finding

that the accused has made a knowing and voluntary waiver of counsel, shall be made on the record prior to allowing the accused to represent himself.

*Id.*; *see also id.* at 251 (Appendix to the Opinion (hereinafter "App.") reprinting a list of the Bench Book questions).

The law of our Circuit has evolved since *McDowell*. If the language of *McDowell* recommended a "formal inquiry" that consists of thirteen questions and one admonishment as specified in the Bench Book (or at least questions that cover "[those] same substantive points," *id.* at 250), our subsequent cases have hewed closer to the underlying concern for setting forth the model inquiry, *i.e.*, the "difficult position" of the district judge, *id.* at 248. Thus, in the post-*McDowell* era, we have required only that the questions be "drawn from, or substantially similar to, the model inquiry set forth in the [Bench Book]," rather than adhere literally to the recommended list of questions in the model inquiry. *United States v. McBride*, 362 F.3d 360, 366 (6th Cir. 2004); *see also United States v. Utrera*, 259 F. App'x 724, 728 (6th Cir. 2008) ("Substantial compliance and not literal adherence to [the model inquiry] is required."). Consistently, we have reviewed a district judge's *Faretta* inquiry on appeal by focusing on whether the judge addressed the "relevant considerations" behind the model inquiry, such as "the defendant's familiarity with the law, . . . the gravity of the charges and the dangers of self-representation," and whether "the defendant's decision to waive counsel is voluntary." *United States v. Miller*, 910 F.2d 1321, 1324 (6th Cir. 1990); *see also United States v. Williams*, 641 F.3d 758, 767 (6th Cir. 2011) ("Very generally, the model inquiry is thirteen questions about the defendant's familiarity with the law and legal system, and the charges against him. This inquiry must be followed by a strong admonishment that the court recommends against the defendant trying to represent himself or herself."). Where the record shows that the defendant "kn[ew] what he [wa]s doing and his choice [wa]s made with eyes open," *Faretta*, 422 U.S. at 835 (internal quotation marks omitted), we have found the *Faretta* inquiry adequate.

## 2. **Whether the *Faretta* Inquiry Was Adequate**

In the case before us, the district judge began the inquiry by asking the following questions:

- "How far did you go in school?"
- "What college did you go to?"
- "Do you have any degrees?"
- "Have you ever studied law?"
- "When you were in college, did you take any courses involving the law either as to the procedure or the substance of the law?"
- "Have you ever represented yourself in a criminal action?"
- "[D]o you understand the crimes you're charged with in this case?" Based on an affirmative answer from Bankston, the judge then asked, "[c]an you list them for me now?"
- "Can you explain to me why you delayed until today while we're impaneling the jury to decide that you wanted to represent yourself?" When Bankston answered, "I've been saying it over and over, [and] I discussed it with my attorneys," the judge asked, "[d]o you have any idea what your defenses are?"
- The judge further stated, "I am just curious as to if you thought through what your defenses are." Based on an affirmative answer from Bankston, the judge then asked, "[h]ow are you going to establish that?"

The judge then warned Bankston of the difficulties of self-representation, stating, "[y]ou've got to decide whether you are really serious about representing yourself. It's a very difficult thing to do." In a similar vein, the judge also asked:

- "Do you understand if you represent yourself, it will be your decision whether you testify or not?"
- "And do you understand that if you represent yourself and testify, I'll make you sit up here in the witness stand[?]"
- "Do you understand that you won't be allowed to consult with your lawyers about how you should answer a question when you're being cross-examined?"
- "Have you ever heard the statement that he who represents himself has a fool for a client?"

When Bankston repeatedly expressed her understanding of the difficulties of self-representation and her wish to do so regardless, the judge inquired one final time, "[o]kay. In

spite of that, you want to represent yourself; is that true?" Bankston responded, "[y]es, I do." The judge then stated: "Let me say for the record that I am satisfied that the defendant has sufficient understanding of the case and sufficient intelligence to undertake the task of representing herself. She has a constitutional right to represent herself."

Under these circumstances, we cannot say that the district judge's inquiry was inadequate under the "substantially similar" standard. First, while Bankston argues that the judge asked only three out of the thirteen model questions,[2] that accounting seems to be incorrect. For instance, the judge informed Bankston of the possibility of taking the stand and the consequences of doing so, as required by the model inquiry. *Compare* R. 242: Voir Dire Tr., at 2754 ("Do you understand if you represent yourself, it will be your decision whether you testify or not? . . . And do you understand that if you represent yourself and testify, I'll make you sit up here in the witness stand?") *with McDowell*, 814 F.2d at 251 (App.) ("(k) You realize, do you not, that if you decide to take the witness stand, you must present your testimony by asking questions yourself? You cannot just take the stand and tell your story. You must proceed question by question through your testimony."). While Bankston also argues that the judge did not mention the statutory maximum penalties at voir dire, the record shows that the district court discussed, at the suggestion of the government, the statutory maximums for each count the following day.[3] Indeed, while we recognize the time lapse between the initial *Faretta* inquiry and when the colloquy on statutory maximums occurred, we do not find it to be a plain error here because the colloquy took place at the beginning of the trial before any evidence was introduced, and, as demonstrated below, the *Faretta* inquiry is not rendered deficient due to the absence of any particular question.

---

[2]Our "3 out of 13 questions" formulation is substantively the same as Bankston's "4 out of 14 questions" characterization. Bankston's characterization construes the "strong admonishment" requirement as a question, rather than a statement, which is how we characterized it in *McDowell*, 814 F.2d at 251 (App.), and how we understand it here.

[3]We reject Bankston's argument that the government's proposal on the first day of trial to go over the statutory maximums suggests that the government knew that the initial *Faretta* inquiry was deficient. Although the government acknowledged that one of the thirteen model questions had not been asked, it did not indicate that the inquiry conducted was inadequate overall. Nor do we find it problematic that it was the government, rather than the district judge, that explicitly discussed the statutory penalties. After thanking the government for placing the statutory penalties on the record, the judge asked Bankston if she "ha[d] any questions about the maximum sentences." Bankston answered, "No."

The "substantial similarity" standard, moreover, does not require a precise accounting of the questions asked.  The critical question under *McDowell* and our subsequent case law is whether, in context, the questions asked by the court meet the objectives of the model inquiry. Hence, while Bankston argues that the judge failed to ask the remaining eight out of the thirteen model inquiry questions, we find that many of those eight questions were in fact addressed during the colloquy, even if the judge did not ask them verbatim.  Upon learning that Bankston did not go to law school, the judge asked whether, in college, Bankston "t[ook] any courses involving the law either as to the procedure or the substance of the law," R. 242: Voir Dire Tr., at 2750–51—an inquiry that "substantially" covers the two model questions regarding the defendant's familiarity with the Federal Rules of Evidence and the Federal Rules of Criminal Procedure.  *See McDowell*, 814 F.2d at 251 (App.) ("(g)" & "(i)").  Similarly, while the judge did not explicitly ask whether Bankston's decision to represent herself was "entirely voluntary on [her] part," *id.* (App.) ("(n)"), the judge asked why she made the decision late when the trial had already commenced, and Bankston answered that she had expressed her desire to represent herself "over and over" to her attorneys after having "discussed it with [them]," R. 242: Voir Dire Tr., at 2751, a response which suggested voluntariness.  The judge also asked Bankston whether, in spite of the difficulties of self-representation, she wanted to represent herself, *id.* at 2755—a question that, again, bears substantial similarity to one of the model questions in the Bench Book.  *See McDowell*, 814 F.2d at 251 (App.)  ("(m) Now, in light of the penalty that you might suffer if you are found guilty and in light of all the difficulties of representing yourself, is it still your desire to represent yourself and to give up your right to be represented by a lawyer?").

We recognize that the remaining four questions were not asked.  We reiterate, however, that our disavowal of "literal adherence" to the model inquiry, *Utrera*, 259 F. App'x at 728, means not only that each individual question need not be identical to one of the Bench Book questions, but also that the overall shortfall as compared to the thirteen questions need not be an error.[4]  Rarely, if ever, have we based the adequacy of the *Faretta* inquiry solely on the precise

---

[4]Where we have found error in the district court's *Faretta* inquiry, it was based on the judge's failure to address the relevant considerations or make the express finding at all—instances clearly distinguishable from the case at issue.  *See, e.g.*, *United States v. Herrera-Martinez*, 985 F.2d 298, 301–02 (6th Cir. 1993) (finding error in

number of the model questions asked.  *See id.* (holding that the district judge "substantially complied with the *McDowell* inquiry" because the Court "rigorously explained the pitfalls of self-representation" and "repeatedly attempted to dissuade [the defendant] from proceeding pro se, point[ing] out that [he] lacked appropriate legal training" and he "would likely increase his risk of conviction" by choosing to represent himself); *Williams*, 641 F.3d at 767 ("The district court's questioning substantially covered the thirteen model questions drawn from the Bench Book . . . ."); *see also Miller*, 910 F.2d at 1324–25.

Finally, Bankston argues that the district judge did not make an express finding that her waiver of counsel was knowing and voluntary, as required by the model inquiry.  *See McDowell*, 814 F.2d at 251 (App.) ("(o)").  The district judge noted, however, that he was "satisfied that the defendant has sufficient understanding of the case and sufficient intelligence to undertake the task of representing herself."  R. 242: Voir Dire Tr., at 2759.  While Bankston contends that this statement does not suffice as an express finding because the judge did not say "knowing and voluntary," the requirement of an express finding is not a magic word test.  We held in *Williams*, "[a]lthough the district court did not specifically find that [the defendant] had knowingly and voluntarily waived his right to counsel," the district judge's statement at issue—"I find that you have the requisite knowledge, education and ability to represent yourself in this matter"— "establishes that [the defendant's] waiver was knowing and voluntary, and the district court *substantially made the required finding*."  641 F.3d at 767 (emphasis added).  The district judge's colloquy and the statement here is virtually indistinguishable from the statement in *Williams*.

In sum, the district court addressed the "relevant considerations"—including "the defendant's familiarity with the law," "the gravity of the charges," and "the dangers of self-representation," *Miller*, 910 F.2d at 1324—by asking a series of questions that were "drawn from, or substantially similar to," the model inquiry questions, *McBride*, 362 F.3d at 366.  The judge also "substantially made the required finding" that Bankston's waiver of counsel was

the district court's inquiry because the judge allowed the defendant to proceed pro se without making any express finding); *United States v. Clemons*, No. 97–6267, 1999 WL 196568, at *4 (6th Cir. 1999) (holding that the defendant's waiver of counsel was ineffective because, inter alia, "[t]he record reveals that the district court did not make this inquiry or warn [the defendant] of the dangers of self-representation").

knowing and voluntary. *Williams*, 641 F.3d at 767. We, therefore, find no error, let alone plain error, in the judge's *Faretta* inquiry.

**B. Defective Indictment as to Count 23**

Count 23 of the operative indictment charged Bankston with violating 18 U.S.C. § 1001 for making false statements in her letter to the district judge when she asserted that the postal inspector who searched her home while investigating Bankston's fraudulent schemes had previously posed as a local police officer and planted the evidence that he later seized from her residence. On appeal, Bankston claims that count 23 was defective because the underlying conduct was not a crime under § 1001(b), *i.e.*, the charge failed to state an offense. Section 1001(b) provides that § 1001(a)—which criminalizes making false statements in "matter[s] within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States"—"does not apply to a party to a judicial proceeding . . . for statements, representations, writings or documents submitted by such party . . . to a judge or magistrate in that proceeding." 18 U.S.C. § 1001(b). Bankston asserts that her conviction on count 23 must, therefore, be vacated.

The government claims that Bankston's challenge to her conviction on count 23 is waived because it was not raised in a pretrial motion pursuant to Rule 12(b). Alternatively, the government contends that Bankston's conduct is not facially exempt because the indictment alleged that Bankston's false statements related to matters "within the jurisdiction of the judicial and executive branches of the United States" and "caused the FBI and IRS agents assigned to the case to perform additional investigation in connection with the Defendant's allegations." We begin with the issue of waiver.

**1. Waiver and Standard of Review**

The government's contention that Bankston's claim is waived presents a threshold question as to which version of Rule 12 applies in this case. The 2013 version of Rule 12— which was in place when Bankston was tried and filed this appeal—stated that "a motion alleging a defect in the indictment" must be filed prior to trial, and that a failure to do so would result in a waiver of that claim. Fed. R. Crim. P. 12(b)(3)(B), 12(e) (2013). This old version of

Rule 12, however, also carved out an exception to the waiver rule stating that "at any time while the case is pending, the court may hear a claim that the indictment or information fails to invoke the court's jurisdiction or to state an offense." Fed. R. Crim. P. 12(b)(3)(B) (2013).**[5]** By contrast, the 2014 version of Rule 12(b)—which took effect on December 1, 2014, when this appeal was pending and is still in force—eliminated the "failure to state an offense" exception, while modifying the consequences of failing to file a 12(b)(3) motion. *See* Fed. R. Crim. P. 12(b)(3)(B)(v) (2014). That is, the current rule states that a failure to file a 12(b)(3) motion prior to trial—including, a motion alleging a failure to state an offense—is "untimely," but that a court may nonetheless "consider [the objection] if the party shows good cause." Fed. R. Crim. P. 12(c)(3) (2014). The government argues that the current version of the rule applies and Bankston's claim is waived, or, alternatively, even if the claim is not waived, it is subject to plain error review because Bankston did not raise it in the district court. Bankston argues that, under the applicable older version of Rule 12, her claim is not only preserved but it is subject to de novo review. We conclude that Bankston has the better argument.

The Supreme Court's order promulgating the 2014 amendments to the Federal Rules of Criminal Procedure stated that the new rules "shall govern in all proceedings in criminal cases thereafter commenced and, *insofar as just and practicable*, all proceedings then pending." S. Ct. Order Amending Fed. R. Crim. P. at ¶ 2 (Apr. 25, 2014) (emphasis added). The language in this order parallels the language in the Rules Enabling Act, which provides that "the Supreme Court shall not require the application of such rule to further proceedings then pending to the extent that, in the opinion of the court in which such proceedings are pending, the application of such rule in such proceedings would *not be feasible or would work injustice*." 28 U.S.C. § 2074(a) (emphasis added). Hence, the applicability of amended Rule 12 depends on whether its retroactive application to cases pending at the time of the amendment would be "just and

---

**[5]**We acknowledge that we have inconsistently applied the now-defunct 12(e) "waiver" provision. As we observed in United States v. Soto, 794 F.3d 635, 649 (6th Cir. 2015), we sometimes construed the party's failure to file a timely pretrial motion as a "true waiver," other times construed it as forfeiture and conducted plain error review, and yet other times avoided "resolving the proper characterization" or examined "whether the appellant had shown good cause for the failure." Id. at 649–50. Because we decide here that the earlier version of Rule 12 applies, and under that version an indictment fails to state an offense when it omits a facially applicable statutory exemption, *see infra*, we do not comment on whether Bankston's defective indictment claim would have been subject to waiver under the current rule.

practicable," or, instead, would "work injustice" or be "[in]feasible."  In the latter circumstances, the old rule governs.  *See Landgraf v. USI Film Prods*, 511 U.S. 244, 275 n.29 (1994) ("Our orders approving amendments to federal procedural rules reflect the commonsense notion that the applicability of such provisions ordinarily depends on the posture of the particular case."); *see also, e.g.*, *Diaz v. Shallbetter*, 984 F.2d 850, 853 (7th Cir. 1993) (holding that the "just and practicable" exception means only that the amendments "may or may not govern" in pending cases, and that it is not a blanket "authorization for retroactive application").

Here, we conclude that application of amended Rule 12 would "work injustice," since, under the current rule, the failure to raise a defective indictment claim in a pre-trial motion may result in a waiver of that claim.  *See* Fed. R. Crim. P. 12(b)(3)(B)(v) (2014).  Indeed, the situation here is much different from the few cases in which we have applied amendments to the Federal Rules retroactively.  In *United States v. Soto*, we applied the 2014 version of Rule 12 to pending proceedings because both the amended rule and its predecessor treated the conduct at issue—a defendant's failure to bring a pre-trial motion to sever the claims—the same way, *i.e.*, as a waiver.  794 F.3d 635, 648–50 & n.2 (6th Cir. 2015).  If anything, the amended rule favored the defendant in *Soto* because, as explained above, it eliminated Rule 12(e)'s reference to "waiver" and instead carved out a "good cause" exception.  Likewise, in *Ridder v. City of Springfield*, we applied an amendment to the Federal Rules of Civil Procedure retroactively in part because the conduct that was subject to sanctions under the amended rule continued even after the amendments took effect.  109 F.3d 288, 296 (6th Cir. 1997).  In the case before us, the older version of Rule 12 was in effect during Bankston's trial and when she filed this appeal, and it contained a "failure to state an offense" exception that could have—and we hold below did—preserve Bankston's claim.  To apply amended Rule 12 to Bankston's claims would hence be unjust.

Under the 2013 version of Rule 12, we provide plenary review to a claim that the allegations of the indictment fail to state an offense.  *See* Fed. R. Crim. P. 12(b)(3)(B); *United States v. Gatewood*, 173 F.3d 983, 986 (1999) (holding that de novo review applies if the claim that the defendant failed to raise under Rule 12(b) is a claim that "contends that the indictment fail[ed] to establish jurisdiction or to charge an offense").  Hence, we review de novo Bankston's

challenge to count 23, mindful that where, as here, an indictment is not challenged until appeal, "the indictment must be construed liberally in favor of its sufficiency." *Id.*

## 2. Whether the Indictment Failed to State an Offense as to Count 23

Bankston argues that the conduct alleged in count 23—writing a letter to the district judge as part of a criminal defense—was not a crime under 18 U.S.C. § 1001 because the statute expressly exempts from criminal liability statements made to a judge in the course of judicial proceedings. *See* 18 U.S.C. § 1001(b).[6]

The exemption, frequently referred to as a "judicial function exception," applies when the defendant shows: "(1) he was a party to a judicial proceeding, (2) his statements were submitted to a judge or magistrate, and (3) his statements were made in that proceeding." *United States v. Vreeland*, 684 F.3d 653, 662 (6th Cir. 2012) (quoting *United States v. McNeil*, 362 F.3d 570, 572 (9th Cir. 2004) (internal quotation marks omitted)); *see also United States v. Holmes*, 840 F.2d 246, 248–49 (4th Cir. 1988). Bankston's letter to the district judge clearly satisfies all three elements of the exception. The fact that the indictment referenced Bankston's false statements in matters "within the jurisdiction of the judicial *and executive branches* of the United States" does not change the analysis. Even construing the indictment liberally, *see Gibson*, 513 F.2d at 979, count 23 is explicitly and exclusively premised on the letter that Bankston wrote to the judge, particularly her allegations regarding the planting of evidence. It is of no legal significance that the false statements in the letter concerned the actions of the executive branch and thus required investigation by the executive agencies. Neither the statute nor our case law discussing the

---

[6]Section 1001(a) sets forth the criminal prohibition, while § 1001(b) provides for the statutory exemption. These provisions state, in relevant parts:

> (a) Except as otherwise provided in this section, whoever, in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, knowingly and willfully--
>
>> (1) falsifies, conceals, or covers up by any trick, scheme, or device a material fact;
>> (2) makes any materially false, fictitious, or fraudulent statement or representation; or
>> (3) makes or uses any false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or entry;
>> shall be fined under this title, imprisoned not more than 5 years . . . .
>
> (b) Subsection (a) does not apply to a party to a judicial proceeding, or that party's counsel, for statements, representations, writings or documents submitted by such party or counsel to a judge or magistrate in that proceeding.

18 U.S.C. § 1001.

judicial function exception takes into account the effect of false statements. *See Vreeland*, 684 F.3d at 662. A contrary interpretation, moreover, would render § 1001(b) inapplicable to all adversarial statements made by a criminal defendant that lead to an investigation by law enforcement.[7]

To find that Bankston's conduct is not a crime under § 1001 does not end our analysis, however, because there is language in *Vreeland* suggesting that the judicial function exception may be an affirmative defense that must be raised by a defendant. *See Vreeland*, 684 F.3d at 662 (stating that the defendant "must show" the three elements of the judicial function exception under § 1001(b)). But the case before us is appreciably different from *Vreeland*. In *Vreeland* and cases like it, the defendant's conduct did not, on its face, fall within the judicial function exception, and thus the applicability of § 1001(b) was in dispute. Indeed, in *Vreeland*, we dealt with whether § 1001(b) applied to false statements made to a probation officer who was assigned to the defendant during his term of supervised release and who prepared the presentence investigation report. We held that it did not because a probation officer is more than a conduit between the defendant and the judge when playing the role of an investigator, and the statements directed at the officer were hence not made in a "judicial proceeding." 684 F.3d at 664–65; *see also United States v. Westberry*, 491 F. App'x 364, 365–66 (4th Cir. 2012) (per curiam); *United States v. Grace*, 396 F. App'x. 65, 65–66 (5th Cir. 2010) (per curiam); *Manning*, 526 F.3d at 618–20. *But see United States v. Horvath*, 492 F.3d 1075, 1080–81 (9th Cir. 2007) (holding that statements made to a probation officer in the course of preparing a presentence investigation report are protected under the § 1001(b) exception). Similarly, in *McNeil*, 362 F.3d at 572—the Ninth Circuit case quoted in *Vreeland*—the court addressed "whether the range of judicial activities implied by [the judicial function exception] includes the inquiry into a defendant's

---

[7]Legislative history supports our conclusion that the effect of false statements on an executive agency does not affect the applicability of the judicial function exception. In codifying § 1001(b), Congress agreed with federal courts that had long recognized that a judicial function exception is "necessary to safeguard from the threat of prosecution statements made in the course of adversarial litigation." H.R. Rep. No. 104-680, at 4 (1996). The fear was that, without the judicial function exception, § 1001 would "chill vigorous advocacy, thereby undermining the adversarial process." Id. Thus, in codifying the judicial function exception, Congress drew a bright-line rule distinguishing "the adjudicative and administrative functions of the court." *Id*. at 9 (noting that "only those representations made to a court when it is acting in its administrative or 'housekeeping' capacity," such as "submissions related to bar membership," are within the scope of criminal prohibition). To consider the effect of false statements as a disqualifying factor—when those statements would otherwise satisfy the judicial function exception—would, therefore, restrict the scope of § 1001(b) contrary to Congress's intent.

financial status for purposes of appointing counsel" and ultimately concluded that it did. In all these cases, there was a dispute—between the parties and across circuits—as to whether § 1001(b) applied to the novel factual circumstances at issue. By contrast, there is no gray area or nuance in applying § 1001(b) to Bankston's conduct: writing a letter to a judge in the course of a criminal defense is the quintessential conduct protected from criminal liability.

Rather than *Vreeland*, this case is more akin to *United States v. Hubbard*, 16 F.3d 694, 697 (6th Cir. 1994), *rev'd on other grounds*, 514 U.S. 695 (1995), where we dealt with false statements that a defendant had made in response to pleadings and motions in a judicial proceeding. We observed in *Hubbard* that the judicial function exception is different from "a formalistic objection to a defect in the indictment" because it "goes to the heart of whether, as a matter of law, [the defendant] can be convicted of the crime with which he was charged." *Id.* at 698. We thus concluded—creating an apparent conflict with *Vreeland*—that a claim that the judicial function exception applies to particular statements is a claim alleging a failure to state an offense and, therefore, is not waived under the old version of Rule 12(b). *Id.*; *see also Gatewood*, 173 F.3d at 986 (noting that, under Rule 12(b), "a defendant who contends that the indictment fails to establish jurisdiction or to charge an offense may raise that challenge at any time"); *United States v. Harrod*, 168 F.3d 887, 890 (6th Cir. 1999) (holding that a claim that the indictment failed to state an offense "can be raised for [the] first time on appeal") (citing *United States v. Forbes*, 16 F.3d 1294, 1297 (1st Cir. 1994)). Drawing upon our discussion in *Hubbard*, we hold in this case that where, as here, the underlying conduct is so patently not a crime that it satisfies § 1001(b) on its face, the indictment fails to state an offense when it charges a false statement crime while omitting the judicial function exception.

Because count 23 is based on conduct that, on the face of the relevant statutory exemption, does not constitute a crime, we find that the indictment failed to state an offense in count 23. We thus vacate Bankston's conviction on count 23. *See Gatewood*, 173 F.3d at 986 (holding that a reversal of conviction is warranted, even without a showing of prejudice, where "the indictment cannot within reason be construed to charge a crime") (quoting *United States v. Hart*, 640 F.2d 856, 857–58 (6th Cir. 1981)).

## C. Due Process Errors Relating to Count 23

Bankston claims that the government's refusal to dismiss count 23, the district judge's failure to recuse himself despite being the recipient of her letter, and her counsel's failure to object to or move to dismiss count 23—either individually or collectively—created an "unfair trial setting" that violated her Fifth Amendment due process rights.[8] Specifically, she asserts that she would not have testified at trial if she had not needed to defend herself against the count 23 charge, and her testimony opened the door to cross-examination in which her prior convictions were revealed. She further claims that the disclosure of her criminal background "infected" the fairness of the entire trial, which warrants vacating her convictions on all counts. We discuss each claim of impropriety before considering the issue of cumulative effect.

### 1. Prosecutorial Misconduct

Because Bankston did not raise a prosecutorial misconduct claim in the district court, we review the prosecutor's conduct only for plain error. *See United States v. Henry*, 545 F.3d 367, 376 (6th Cir. 2008). As described above, Bankston must show that the alleged error was not only plain, but that it affected her substantial rights and implicated the fairness, integrity, or reputation of the trial. *See Johnson*, 520 U.S. at 466–69.

We have already held that count 23 was improperly charged, and that her conviction on that count must thus be vacated. While Bankston also seeks to invalidate her convictions on the other counts based on alleged prosecutorial misconduct in pursuing the § 1001 charge, she cites no precedent supporting her contention that the prosecutor's decision to pursue a charge—however ill-conceived—can by itself constitute a due process error, absent evidence of an improper motive, inflammatory rhetoric, or other conduct "tend[ing] to mislead the jury or

---

[8]The government does not respond to any of these arguments. Instead, the government argues only that Bankston cannot raise an ineffective assistance of counsel claim because her decision to represent herself "rendered [her counsel's] actions beyond the scope of an ineffective assistance challenge." The government is wrong. Bankston has a viable ineffective assistance claim because the conduct to which she objects—her counsel's failure to move to dismiss count 23—occurred during the time when she was represented by counsel, *i.e.*, after the district judge appointed trial counsel and before Bankston began representing herself at voir dire. *See Wilson v. Parker*, 515 F.3d 682, 698 (6th Cir. 2008) (stating that, where the conduct that gives rise to an ineffective assistance of counsel claim occurs prior to waiver, "the logic . . . that exercising the *Faretta* right to represent oneself necessarily eliminates claims of ineffective assistance does not apply").

prejudice the defendant." *Cristini v. McKee*, 526 F.3d 888, 899 (6th Cir. 2008) (quoting *United States v. Carter*, 236 F.3d 777, 783 (6th Cir. 2001)). Indeed, while the prosecutor's pursuit of count 23 in light of a facially applicable statutory exemption was "improper," we cannot conclude here that such behavior was "flagrant," as typically required by our case law. *Cristini*, 526 F.3d at 899; *see United States v. Carroll*, 26 F.3d 1380, 1385–86 (6th Cir. 1994) (holding that improper but non-flagrant prosecutorial conduct requires a new trial if "(1) proof of defendant's guilt is not overwhelming, *and* (2) defense counsel objected, *and* (3) the trial court failed to cure the error with an admonishment to the jury.") (quoting *United States v. Bess*, 593 F.2d 749, 757 (6th Cir. 1979)).

Moreover, Bankston has not shown the requisite prejudice to warrant a new trial on the remaining twenty-two counts. *See Carroll*, 26 F.3d at 1385–86. Bankston does not claim that the evidence on most of the other counts was insufficient to support the jury's verdicts, and our review of the record persuades us that the jury heard ample evidence of her guilt. *See, e.g.*, *infra* Section II.D (rejecting sufficiency-of-the-evidence claim concerning counts 16 and 18). Additionally, the district court gave a limiting instruction about her prior convictions, remarking to the jury:

> Let me interrupt and say that the fact that the defendant has these prior convictions is not any proof whatsoever that she's committed the crimes that are alleged in the third superseding indictment. That testimony is admissible, so you may consider it with respect to her credibility. That's the purpose for the court admitting the testimony to come in. You may consider the fact of a prior conviction as it relates to your determination as to her credibility, but it is—the fact of the prior convictions, the fact of being in prison is no proof that she's committed any of the crimes that are alleged in the superseding indictment—third superseding indictment.

In short, Bankston's claim of prosecutorial misconduct fails because she has not shown any of the requisite elements for establishing a due process error—that the proof of her guilt was not overwhelming, that she objected to the improper conduct, and that the court failed to cure the error with an admonishment to the jury. *See Carroll*, 26 F.3d at 1390. Accordingly, we reject Bankston's claim that she is entitled to a new trial based on prosecutorial misconduct.

**2. Judicial Bias**

Bankston's judicial bias claim is also unpreserved and hence is subject to plain error review. *See United States v. Hynes*, 467 F.3d 951, 957–58 (6th Cir. 2006) ("[W]here the defendant does not contemporaneously object to the trial court's conduct, we review that conduct under the plain-error standard."). The claim would be unavailing under any standard, however. While Bankston argues that the trial judge should have recused himself because he was the "victim" of the false statement crime, she fails to explain how the one remark by the judge on which she relies—"where is the evidence that she submitted the handwritten letter to me?"—reflects bias. Indeed, contrary to Bankston's contention, the district judge suggested dismissing count 23. The government declined, stating, "you can't lie to a court. I'm not going to allow that to occur." In the end, there is no indication in the record that the judge exhibited a "high degree of favoritism or antagonism" necessary to support judicial bias. *Liteky v. United States*, 510 U.S. 540, 555 (1994); *see also id.* at 551 (stating that a judge's conduct may be "characterized as 'bias' or 'prejudice'" warranting recusal only if "it is so extreme as to display clear inability to render fair judgment"); *Lyell v. Renico*, 470 F.3d 1177, 1187 (6th Cir. 2006) (holding that a recusal was warranted where the trial judge "took over the cross-examination of the central witness in the case . . . and elicited information not revealed on direct examination" and "chose to limit questioning [of the witness] on her own" absent objection from the prosecutor). Thus, we reject Bankston's claim of judicial bias.

**3. Ineffective Assistance of Counsel**

Bankston asserts that her court-appointed attorney provided ineffective assistance in failing to object to and move to dismiss count 23 during the period in which the attorney represented Bankston. While we do not typically consider ineffective assistance of counsel claims on direct appeal, we depart from that practice where "the existing record is adequate to assess properly the merits of the claim." *Hynes*, 467 F.3d at 969 (quoting *United States v. Franklin*, 415 F.3d 537, 555–56 (6th Cir. 2005)). Here, we find that the record is adequate and hence review Bankston's claim de novo. *See Mallett v. United States*, 334 F.3d 491, 497 (6th Cir. 2003) ("Ineffective assistance of counsel claims are mixed questions of law and fact, which we review *de novo* on appeal.").

Under *Strickland v. Washington*, 466 U.S. 668, 687–94 (1984), a defendant must satisfy a two-pronged standard to demonstrate ineffective assistance of counsel. First, the defendant must show that counsel's performance was "deficient," *i.e.*, that it "fell below an objective standard of reasonableness." *Id.* at 687–88. Second, the defendant must show that the deficient performance by counsel was prejudicial to the defense. *Id.* This showing of prejudice requires "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.; *accord Rayner v. Mills*, 685 F.3d 631, 636 (6th Cir. 2012).

Trial counsel's failure to object to or move to dismiss count 23 satisfies the performance prong of *Strickland*. *See Magana v. Hofbauer*, 263 F.3d 542, 550 (6th Cir. 2001) (holding that counsel's "complete ignorance of the relevant law under which his client was charged" fell below the objective standard of reasonableness); *Washington v. Hofbauer*, 228 F.3d 689, 702 (6th Cir. 2000) (finding that counsel's failure to object to prosecutorial misconduct may constitute a deficient performance where the "failure is due to . . . lack of knowledge of controlling law, rather than reasonable trial strategy"). We also find prejudice as to count 23 because there is a reasonable probability that, had Bankston's counsel objected to count 23, the charge would have been dismissed. *See Strickland*, 466 U.S. at 694 (stating that a reasonable probability is "a probability sufficient to undermine confidence in the outcome"). This prejudice, however, has been addressed by our conclusion that her conviction on count 23 must be stricken based on the indictment's failure to state an offense. In other words, any remedy for ineffective assistance of counsel regarding count 23 is mooted by the remedy we have already afforded on an alternative basis.

While Bankston makes passing references to broader prejudice to her convictions on other counts resulting from the revelation at trial of her prior convictions, she does not develop this argument fully. Hence, the claim is waived. *See United States v. Sandridge*, 385 F.3d 1032, 1035–36 (6th Cir. 2004) ("Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.") (quoting *Popovich v. Cuyahoga Cnty. Ct. of Common Pleas*, 276 F.3d 808, 823 (6th Cir. 2002)); *McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997) ("It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones.") (quoting *Citizens Awareness*

*Network, Inc. v. U.S. Nuclear Reg. Comm'n*, 59 F.3d 284, 293–94 (1st Cir. 1995)). We add, moreover, that even if we were to address the claim of broader prejudice, we would find no such prejudice for the reasons stated *supra*, Section II.C.1—namely, that the jury otherwise heard ample evidence of her guilt and the court gave a limiting instruction.

### 4. Cumulative Effect

Bankston argues that, even if each asserted impropriety relating to her count 23 conviction does not on its own result in denial of her constitutional right to a fair trial, the cumulative effect of the errors created an unfair trial setting that violated her due process rights. The existence of only one error, however, eliminates the foundation of her cumulative-effect theory. Indeed, our recognition of the cumulative-effect theory has been limited to situations where "[e]rrors that might not be so prejudicial as to amount to a deprivation of due process when considered alone, may cumulatively produce a trial setting that is fundamentally unfair." *United States v. Hernandez*, 227 F.3d 686, 697 (6th Cir. 2000) (quoting *Walker v. Engle*, 703 F.2d 959, 963 (6th Cir. 1983)). Here, we conclude that there is no prosecutorial misconduct or judicial bias, not that any error committed by the prosecutor or the judge was harmless. *See United States v. Trujillo*, 376 F.3d 593, 614 (6th Cir. 2004) (holding that, to establish cumulative error, defendant must show that "the combined effect of individually harmless errors was so prejudicial as to render his trial fundamentally unfair"). In short, Bankston's cumulative effect argument fails because there is no cumulation of errors. *See, e.g., Baze v. Parker*, 371 F.3d 310, 330 (6th Cir. 2004) (denying a due process claim based on the cumulative effect argument because the defendant "cannot establish any errors to cumulate").

## D. Insufficiency of Evidence as to Count 16 Wire Fraud and Count 18 Mail Fraud

Bankston argues that the record is insufficient to support the jury's findings of guilt on count 16, alleging wire fraud, and count 18, alleging mail fraud, because the government failed to prove the use of an interstate wire communication or the mails. We review sufficiency of the evidence de novo, affirming the defendant's convictions if, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Cunningham*, 679 F.3d 355,

369 (6th Cir. 2012) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). We must draw "all available inferences and resolve all issues of credibility in favor of the jury's verdict." *United States v. Smith*, 749 F.3d 465, 477 (6th Cir. 2014) (quoting *United States v. Salgado*, 250 F.3d 438, 446 (6th Cir. 2001)).

### 1. Count 16 Wire Fraud

To prove wire fraud under 18 U.S.C. § 1343, the government must show, inter alia, that the defendant "used or caused to be used an interstate wire communication in furtherance of the scheme." *Cunningham*, 679 F.3d at 370. The indictment stated that Bankston filled out the Lending Club loan application online from her home in Ohio and, in doing so, connected to the Lending Club server physically located in Las Vegas, Nevada. Bankston contends that the government failed to prove that the server was in fact located in Las Vegas or, alternatively, that it was located in any specific place outside Ohio.

The record belies Bankston's contention. Eric Kinney, from Lending Club's Fraud Operations, testified that, while he could not be certain as to which, the server could have been located in "Nevada, California, Santa Clara" at the time that Bankston filled out the loan application. By contrast, there was no evidence suggesting that the server could have been in Ohio. The government was not obliged to prove the actual location of the Lending Club server, only that Bankston's transaction involved the use of an interstate wire. *See Gambill v. United States*, 276 F.2d 180, 181 (6th Cir. 1960) (holding that the government "need not prove everything in an indictment but only so much thereof as establishes a violation of the statute"). Viewing the testimony in the light most favorable to the prosecution, we conclude that sufficient evidence supported the jury's finding that the government proved the interstate wire element of count 16.

### 2. Count 18 Mail Fraud

Bankston's argument regarding count 18 fails for similar reasons. Mail fraud, as specified in 18 U.S.C. § 1341, requires a showing, inter alia, that the defendant's conduct involved "a use of the mails." *United States v. Crossley*, 224 F.3d 847, 857 (6th Cir. 2000). While Bankston argues that the government failed to show the use of the mails element

(particularly that the Citizens Bank credit card was mailed in the first place), witness testimony at trial suggests otherwise. Bankston's co-conspirator Hale testified that she "knew" that the Citizens Bank credit card "ended up" with Bankston, and that she was familiar with Bankston's practice of receiving "documents in the mail such as debit cards," which were directed to individuals whose identities she had obtained, including that of Rachelle Butler. Butler—the victim of Bankston's identity theft—also testified as to the bank statements from Citizens Bank documenting the use of the credit card, which appeared to have been mailed to Butler, but which she did not receive seemingly due to the mail hold that Bankston had placed on her address. Based on these testimonies, we cannot conclude that no rational juror could have found the use of the mails beyond a reasonable doubt.

**E. Sentencing**

Bankston argues that the district court committed multiple errors in sentencing that require resentencing on all but the aggravated identity theft counts (counts 6, 8, 19, and 22).[9] Specifically, Bankston contends that the district court (i) incorrectly used a base offense level ("BOL") of 27 when it had previously determined the correct level to be 25, (ii) departed from the recommended criminal history category ("CHC") without an adequate explanation, and (iii) failed to rule on the disputed loss amounts from Bankston's fraudulent schemes. The government concedes that the district judge erred in using a BOL of 27 and agrees that the case should be remanded for resentencing on all non-aggravated identity theft counts. The government does not address the other alleged sentencing errors.

It is clear, based on the record and the parties' agreement on the issue, that the district judge erroneously used a BOL of 27 when it had earlier ruled that the level should be 25. *Compare* R. 254: Sentencing Hr'g Tr. at 4842–43 (the district judge remarking, "so I get an adjusted offense level of 25") *with id.* at 4844–45 (the judge remarking, without an explanation,

---

[9]Aggravated identity theft convictions are treated separately for sentencing purposes, with each conviction supporting a mandatory two-year sentence that has to be served consecutively with the sentence imposed for other crimes. *See* 18 U.S.C. § 1028A(b)(2). Where, as here, the defendant is convicted of more than one aggravated identity theft charges, the sentences for all aggravated identity theft convictions may, in the discretion of the sentencing court, run concurrently with each other. *See id.* § 1028A(b)(4).

that "[t]he offense level has been fixed at 27"). This error, alone, warrants remanding the case for resentencing on all but the aggravated identity theft counts.

We also address, however, the two additional errors raised by Bankston because they are relevant to the proceedings on remand. Her argument that the district court failed to explain its departure from the recommended CHC appears not to have been raised in the district court and is thus subject to plain error review. *See United States v. Mabee*, 765 F.3d 666, 671 (6th Cir. 2014). We have held that "[a] court departing upward from a defendant's calculated [CHC]" must "'articulate its reasons for departing from the guidelines in language relating to the guidelines.'" *United States v. Schultz*, 14 F.3d 1093, 1101 (6th Cir. 1994) (quoting *United States v. Kennedy*, 893 F.2d 825, 829 (6th Cir. 1990)). Here, the district judge departed from the calculated CHC of V to VI without providing any explanation. Simply stating that the court "grants the motion and affixes the criminal history category as VI"—without specifying the reasons "in language relating to the guidelines," *Schultz*, 14 F.3d at 1101—is not sufficient.

Bankston's claim that the district court failed to resolve the dispute over the loss amounts is preserved, and we review it de novo. *See United States v. Triana*, 468 F.3d 308, 321 (6th Cir. 2006). Bankston points to three separate loss amounts—one concerning the Ohio Department of Jobs and Family Services ("ODJFS"), another concerning Wells Fargo, and another one concerning the Dollar Bank. Federal Rule of Criminal Procedure 32(i)(3)(B) states that a sentencing court "must—for any disputed portion of the presentence report or other controverted matter—rule on the dispute or determine that a ruling is unnecessary either because the matter will not affect sentencing, or because the court will not consider the matter in sentencing." We have required "literal compliance" with this rule. *United States v. Nelson*, 356 F.3d 719, 722–23 (6th Cir. 2004) (citing *United States v. Monus*, 128 F.3d 376, 396 (6th Cir. 1997)). Hence, while the district court "need not establish the value of the loss with precision," the court must "publish the resolution of contested factual matters that formed the basis of the calculation." *Id.* at 723. A mere expression of an agreement with the government's proposed loss amount—without "explain[ing] how [the court] calculated the amount of loss and . . . respond[ing] to the defendant's 'specific factual objections to the methods of calculation'"—does not suffice. *Id.* (quoting. *Monus*, 128 F.3d at 396–97).

Here, the district court determined that a dispute on the Dollar Bank loss amount does not affect sentencing.  It is not apparent from the record whether the court ruled on the disputed loss amounts of ODJFS and Wells Fargo.  When the government explained the fraudulent scheme that resulted in ODJFS's loss, the district court merely asked that the loss be "demonstrated by some particular exhibit," but did not specifically find that the government's loss amount was correct or explain how the court arrived at that amount.  Similarly, we are unable to discern from the record—especially in light of the government's failure to rebut Bankston's claim in its brief—any explanation from the district court about why Wells Fargo's loss was not inflated, contrary to Bankston's claim.  Accordingly, in remanding the case for resentencing, we instruct the district court to provide an explanation for any upward departure in the CHC and resolve the remaining factual disputes regarding the loss amounts.**[10]**

## III.

For the foregoing reasons, we **VACATE** Bankston's conviction on count 23, **AFFIRM** her other convictions, and **REMAND** the case for resentencing.

---

**[10]**We decline to address whether the district court incorrectly calculated the loss amounts.  Bankston will have an opportunity to make this argument to the district court on remand.  We also decline to address whether the district judge's remark—that he has "32 months of discretion" within the 130-to-162-months guideline range—reflects his mistaken understanding that the guidelines sentencing range is binding.  To the extent that the judge's remark suggests anything more than inartful phrasing, the district court on remand should treat the guidelines as advisory in accordance with *United States v. Booker*, 543 U.S. 220, 266–67 (2005).